1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

8  GOVANI P. WHITE,                 )   No. C 05-4341 MJJ (PR)
                                    )
9              Petitioner,          )   **ORDER DENYING PETITION**
                                    )   **FOR WRIT OF HABEAS CORPUS**
10      vs.                         )
                                    )
11  S.W. ORNOSKI, Warden,           )
                                    )
12             Respondent.          )
   _____  )
13

14          Petitioner, a California prisoner proceeding pro se, filed the above-entitled petition for

15  a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The Court ordered respondent to show

16  cause why the petition should not be granted based on petitioner's cognizable claims for

17  relief.  Respondent has filed an answer and memorandum in support thereof.  Petitioner did

18  not file a traverse.

19                          **PROCEDURAL BACKGROUND**

20          In 2002, petitioner was convicted by a jury in Santa Clara County Superior Court of

21  kidnapping to commit robbery, second degree robbery, carjacking, and making criminal

22  threats.  Petitioner was sentenced to life in prison with the possibility of parole.  The

23  California Court of Appeal affirmed his conviction and denied his habeas petition.  In a

24  consolidated opinion, the California Supreme Court denied his petitions for review of these

25  decisions by the California Court of Appeal.

26
27
28

**United States District Court**
For the Northern District of California

1

**FACTUAL BACKGROUND**

2

The following facts are taken from the opinion of the California Court of Appeal**:**

3

Jesus Solorio was 21 years old at the time of his September 2002 trial
testimony, and lived in Hollister. His family owned a white 1995 Toyota
Corolla in June 2001. He paid for the installation of three televisions, a
PlayStation, a Pioneer stereo, and 12-inch speakers in the car. One television
was in the front on the dash, the other two were on the back of the front seats of
the car. The PlayStation was kept underneath the front passenger's seat, and
could be used with any of the three televisions. The speakers were in the trunk.

The night of June 17, 2001, Solorio drove the car to the Club Tropicana
in San Jose with four female friends. He parked in a lot about one block away.
They all got out and walked towards the club. Although the women went
inside, he went back to his car because he forgot his wallet. Other people were
scattered around the parking lot when he searched his car and found his wallet
under a seat. Two men that Solorio identified at trial as defendants White and
Gadsden walked towards the car and White said, " 'That's a nice car.' " Solorio
stayed by his car and talked to defendants. They asked him about the items he
had in the car as he was sitting in the driver's seat making sure that he had
secured everything. White opened the front passenger door and sat down
inside. Gadsden got in behind him and said that he wanted to play the
PlayStation. Solorio allowed Gadsden to play the PlayStation for four or five
minutes.

Other people were around another car showing off its hydraulics in the
parking lot. A policeman drove into the lot and told everyone to leave, that they
could not stay there. White pointed a gun with a long barrel that was tucked in
his shirt at Solorio and said, "Drive." Solorio took off and drove defendants at
White's direction because he was afraid. During the drive defendants talked
about where they should take Solorio and about what they wanted out of the
car. White wanted the television and Gadsden wanted the PlayStation.

After about ten minutes they arrived at some apartments on a dead-end
street. Solorio stopped the car and defendants started to strip it. White
attempted to take the television out of the dash and Gadsden took out the
PlayStation. They discussed who was going to keep the stereo parts; White
wanted the equalizer and Gadsden wanted the amp and speakers. White told
Solorio to take everything out of his pockets, so Solorio got out of the car and
gave White his wallet. White opened the wallet and said, " 'If anything
happens, I know where you live.' " Gadsden then told Solorio to get down on
his knees. Gadsden pointed a gun at Solorio while White struggled to get the
television out of the dash. After a minute or two, White told Solorio to get back
in the car.

White gave directions to Solorio to drive to an alley and to stop there. It
was dark but Solorio could see that they were at an apartment complex. Cars
were parked and there was a dumpster. Solorio asked to be let go, but White hit
him with his fist and said, " 'Be quiet.' " White told Solorio to get out of the car
and said that if he did anything, " 'I'm going to kill you.' " Solorio did not run
because White was still pointing a gun at him. He went around the front of the
car and stood by the back passenger side door. The car door was open and
Solorio could see Gadsden ripping the equalizer's wiring out while White took
the stereo out of the dashboard. White put the removed items, including the
speakers from the trunk, in a multicolored blanket in the back seat of Solorio's
car, and then put everything in a shopping cart.

White told Gadsden that they should take Solorio somewhere, but Gadsden told him to forget it, that Solorio would not say anything, and to let him go. Gadsden told Solorio to stay there until White returned. White left with the shopping cart, saying that they should put Solorio in the trunk, kill him, and throw him in the river. Gadsden ordered Solorio, at gunpoint, to get into the trunk of the car, so he did. Gadsden attempted to close the trunk lid two or three times, but Solorio stuck a tire iron out to prevent it from closing. When Gadsden opened the trunk lid to see what was going on, Solorio hit him in the stomach with the tire iron. Gadsden went down. Solorio climbed out of the trunk and ran the opposite direction from where White had gone. While he was running, he heard a gunshot behind him. He kept running, jumped a fence at a school, and then jumped another fence. A man he met took him to a police officer.

The officer drove Solorio back to where his car had been, but it was not there. He reported his car, television, stereo, speakers, amp, equalizer, cell phone, wallet, and PlayStation missing. He said that White was wearing an athletic jacket, Gadsden was wearing a bandana, and they both were wearing fishing hats. He suffered bruises from where White hit him.

Detective Anthony Mata was assigned Solorio's case on June 19, 2001. He spoke with Solorio that day at the police department, and did not observe any physical injuries. He made a list of the property that was reported missing and checked Solorio's cell phone records. He then asked other officers for assistance with a parole search for an individual (not either of the defendants) at a Fallingtree Drive residence in San Jose.

Sergeant Robert St. Amour, Officer Manuel Guerrero, Detective David Gutierrez, and Detective Paul Joseph assisted Detective Mata with the parole search at the Fallingtree Drive residence at 10:45 a.m. on June 22, 2001. While waiting to do the search, Detective Mata heard a radio broadcast that officers conducting surveillance had observed Solorio's car pull up to the residence. Somebody left the residence and entered the car, and the car then drove away. Guerrero saw Solorio's car leave the residence and attempted to initiate a vehicle stop of the car by activating his patrol car's emergency lighting. The car did not pull over, so Officer Guerrero activated his siren. The car still did not pull over, but continued on to an onramp to northbound I-680. There it came to a slow roll and both the driver's door and passenger's door swung open. The two occupants exited the car and ran. Officer Guerrero started chasing them on foot, but they disappeared into a wooded area. Officer Guerrero broadcast the description of the two suspects.

Sergeant St. Amour saw a young male who matched the description of one of the suspects. The man was wearing a blue shirt and a white tee shirt. Sergeant St. Amour directed Sergeant Alex Nguyen to the area where he saw the man run. Sergeant Nguyen found the man inside a nearby house and took him into custody. The man was identified at trial as Byron Finister.

Officer Gutierrez and Detective Joseph saw another young male who matched the description of one of the suspects. The man was not wearing a shirt, was sweating, and appeared out of breath. Officer Gutierrez detained the man, who was identified at trial as Gadsden. Detective Mata searched Gadsden and found Solorio's cell phone in his pants pocket.

Detectives Mata and Joseph returned to the Fallingtree Drive residence to conduct the parole search. Detective Mata found a denim fishing hat in the garage of the residence. Detective Mata also found a police baton and Solorio's wallet. Detective Joseph found a box containing stereo wire with frayed ends and personal papers and letters. He found a blue backpack in the rafters of the

garage that contained stereo wire similar to the other [wire] found, as well as a car CD player/radio, equalizer, and faceplate. Detective Joseph also found Solorio's driver's license, some wallet inserts, and pictures in the garage rafters.

Officer Aaron Guglielmelli examined Solorio's car on June 22, 2001. He did not notice any damage, marks, scratches, dents, or chips in the trunk area.

Detective Mata thereafter decided to conduct surveillance at a residence on Vista Glen Avenue in San Jose. Sergeant St. Amour and Detective Joseph searched the Vista Glen residence on June 22, 2001. They found White in the garage of the residence which had been converted into living quarters. White and Nathan Green were arrested there. Michelle Hermosillo, Green's mother, later met with Detective Mata. Hermosillo was aware that White kept property at her home, and told Mata that White's brother Jovarre had come to her home and taken away some property. The property was in a bag, and she had no idea what it was. Mata recovered a gray fishing hat and a black bandanna from the garage.

Detective Mata returned to the Fallingtree Drive address, where he spoke to Jasmine W. and her father. On Monday, June 18, 2001, at about 2:30 a.m., Jasmine was at home with Finister and her boyfriend, Felix Taplin, when Gadsden came into the garage. Mata testified that Jasmine told him that Gadsden placed a multicolored blanket on the ground and that, when he opened it, it contained a PlayStation, CDs, and stereo equipment. She said that Gadsden stated that he had just robbed somebody. She said that White spent the night and left early in the morning. She said that afternoon she saw Gadsden washing a white car in her driveway. Detective Mata recovered Solorio's multicolored blanket from the garage. Jasmine denied at trial that she owned the multicolored blanket, and denied that she made any of the statements Mata reported she did. She testified that she was aware that Taplin was charged with possession of stolen property as a co-defendant in this case, but she was not aware that he had pleaded guilty.

Detective Mata determined that the incident took place in the general vicinity of the El Rancho Verde apartment complex, and that both defendants lived in the vicinity. He searched the carport area of the complex, but found no weapons or casings, or any other evidence that a weapon had been discharged in the area.

Detective Mata requested that White's jail telephone calls be monitored. On June 23, 2001, Mata received a copy of White's taped phone conversations with his mother, Cheryl. During the first conversation, White told his mother to "go clean my room up," and to tell Jovarre to "sell his speakers." He asked his mother to "go in my room" and "anything you see that is not right then . . . pick it up" "because . . . I think mike's . . . there." "Those things that are on the side of the couch too." He said that "they [are] saying that we used a pellet gun," and responded "I don't know" when his mother asked him where the pellet gun was. Cheryl told White that she knew "mike" and that she "got it," but that she did not see "the other thing." White told her take something "gray" that she had found. She also got "things that you put in" "mike." She told him that she took "long" but not what "long holds." She could not find "an orange box that has little gold things in it." Downstairs, she found "a blue and gray box, [that] has tools in it," and White told her to "tell him to get those . . . things out of there . . . ASAP." During the second conversation, Cheryl told defendant that she found "the orange case" and "that fake thing," and defendant told her to "get those all out of the house."

After listening to the tape, Detective Mata went to the White household. He knocked on the door, and saw Jovarre go in and out of a window. He was

let inside after about 20 minutes. Cheryl came inside the house through the rear door, and Mata met her in the kitchen/living room area. He told her about her taped phone conversations with White. She denied having had the conversations. Mata saw Solorio's speaker box in the living room area, and asked her who owned it. She said that she did not know. She finally admitted to having the phone conversations with White. She said that "long" was also known as "Mike," and was a rifle that was in her bedroom closet. She said that she knew what "short" meant, and that she did not find it, but that she did find a pellet gun. She said that she had "silver," which was the ammunition to "short." She said that she had put "silver" in her car. Detective Mata recovered the speaker box, a rifle from Cheryl's bedroom, an athletic jacket and two pairs of athletic gloves from White's bedroom, ammunition and a suede gun case from Jovarre's bedroom, and a pellet gun and an orange box of .22 ammunition from Cheryl's vehicle that was parked in the back of the residence. He did not find a handgun that could match the suede gun case.

White testified in his own defense as follows. Prior to his arrest, he had been living in the garage area of Green's home. He had not lived with his mother for about six months. Half of his things were at his mother's, half were at Green's.

On the night of June 17, 2001, White borrowed his friend Fernando's Mazda and went with Green to pick up his friend Samuel. They ran into Gadsden when they were leaving Samuel's place. Gadsden asked if he could go with him. The four of them then went downtown. They parked in a parking lot by Club Tropicana because that is where Fernando was showing off a car he had just bought from Green. A lot of other people were there. Fernando started playing with the hydraulics on his new car while White and Green talked to some girls.

After about 45 minutes, Fernando's girlfriend called, wanting him home. Fernando told White that he wanted to take the Mazda. Green offered to drive the hydraulic car and got into the car. White went over and told Gadsden that they were leaving. Gadsden was in the front passenger seat of a white car playing with a PlayStation and Solorio was in the driver's seat. Solorio asked, "Do you guys know where to get some ecstasy?" Gadsden said, "Yeah."

A police officer drove up and told everybody to leave. White went back to the Mazda but Gadsden stayed in Solorio's car. After the officer left, White went back to Gadsden. Gadsden said that he was going with Solorio. White decided to go with them, and got in behind Solorio. Gadsden gave Solorio directions to the El Rancho Verde apartments. When they arrived Gadsden was still playing with the PlayStation, and asked White to see if "Jesse" was home. White went to Jesse's apartment and saw that his upstairs bedroom light was off. White threw rocks at Jesse's bedroom window but nobody responded. When he returned to the car Solorio and Gadsden had switched seats, the car's trunk was open, and speakers were in a shopping cart. Gadsden was "messing with something in the front," and White asked him what he was doing. Solorio looked frightened. Gadsden and Solorio got out of the car, and White started arguing with Gadsden. Solorio stood there for a while, until White looked over at him and said, "Man, you're stupid." Solorio then ran.

Gadsden got into the car and drove off, leaving the shopping cart containing the speakers. White heard no gunshots. He started to walk away, but then decided to take the speakers. He took them to his mother's house, which was near by. It was then that he noticed that his cell phone was missing. He

started calling his cell phone number and finally, after "a long, long time," Gadsden answered it. White said, " 'Whatever you do is on you. Just give me my phone.' " Gadsden hung up on him. White wanted his phone, so he called Green and the two of them went looking for Gadsden. When they did not find him, they went back to Green's house. White found Gadsden the next afternoon, and got his cell phone back. He did not call the police because he did not want to be involved; there was also a warrant out for his arrest.

White was arrested at Nathan Green's on June 22. He denied to Detectives Mata and Joseph that he knew anything about what happened on June 17 and 18. He called his mother from the jail and talked to her in code because he knew that the call was monitored. He wanted everything out of the house because he knew the police were going to search it. He did not use a gun on Solorio, but he did not want any weapons found because he did not want the police "to get the wrong impression."

People v. White, No. H025341, Slip Op. at 2-10 (Cal. Ct. App. April 5, 2004) (hereinafter "Slip Op.") (attached as Resp.'s Ex. F) (footnotes omitted).

## DISCUSSION

**A.**   **Petitioner's Claims**

The instant federal habeas corpus petition presents six cognizable claims, all predicated on the ineffective assistance of counsel in the state proceedings.  Petitioner claims his right to effective assistance of counsel was violated when: (1) his attorney failed to object on due process grounds to the admission of evidence that he owned guns and ammunition; (2) his attorney failed to object on due process grounds to the admission of evidence that there was a warrant out for his arrest at the time of offense; (3) his attorney failed to object on Confrontation Clause grounds to the admission of Cheryl White's hearsay statements to Detective Mata; (4) his attorney failed to request a limiting jury instruction regarding Taplin's no contest plea; (5) his attorney failed to argue that Solorio's alleged request to purchase ecstasy should be admitted as circumstantial evidence of Solorio's intent to willingly accompany petitioner; (6) his attorney failed to object to the exclusion of evidence of Solorio's prior misdemeanor conviction on the grounds that excluding such evidence violated petitioner's constitutional rights to due process, to confront witnesses against him, and to present a defense**.**

1

**B.**    **Standard of Review**

2

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a district

3

court may grant a petition challenging a state conviction or sentence on the basis of a claim

4

that was reviewed on the merits in state court only if the state court's adjudication: "(1)

5

resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

6

established Federal law, as determined by the Supreme Court of the United States; or (2)

7

resulted in a decision that was based on an unreasonable determination of the facts in light of

8

the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

9

Under the 'contrary to' clause of 28 U.S.C. § 2254(d)(1), a federal court may grant a

10

writ if the state court's conclusion is "opposite to that reached by this Court on a question of

11

law or if the state court decides a case differently than this Court has on a set of materially

12

indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 413 (2000). An

13

'unreasonable application' occurs when the state court identifies "the correct governing legal

14

principle" from the appropriate Supreme Court decision but "unreasonably applies that

15

principle to the facts of the prisoner's case." Id. at 412-13. The federal court on habeas

16

review may not issue the writ "simply because that court concludes in its independent

17

judgment that the relevant state-court decision applied clearly established federal law

18

erroneously or incorrectly." Id. at 411. Rather, the application must be "objectively

19

unreasonable" to support granting the writ. Id. at 409.

20

In any event, habeas relief is warranted only if the constitutional error at issue is

21

structural error or had a "'substantial and injurious effect or influence in determining the

22

jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795-6 (2001) (quoting Brecht v.

23

Abrahamson, 507 U.S. 619, 638 (1993)). When there is no reasoned opinion from the

24

highest state court to consider the petitioner's claims, the court looks to the last reasoned

25

opinion, in this case that of the California Court of Appeal. Ylst v. Nunnemaker, 501 U.S.

26

797, 801-6 (1991).

27

28

1

**C.**     <u>Ineffective Assistance of Counsel</u>

2

All of petitioner's claims allege a violation of his Sixth Amendment right to counsel,

3

which guarantees not only assistance, but "effective assistance" of counsel.  <u>Strickland v.</u>

4

<u>Washington</u>, 466 U.S. 668, 686 (1984).  The "benchmark"  for ineffectiveness is "whether

5

counsel's conduct so undermined the proper functioning of the adversarial process that the

6

trial cannot be relied upon as having produced a just result."  <u>Id.</u>  To prevail on an

7

ineffectiveness claim, petitioner must satisfy two prongs of inquiry.

8

The first prong is deficiency: petitioner must show that counsel's performance fell

9

below an "objective standard of reasonableness" under prevailing professional norms.  <u>Id.</u> at

10

687-88.  Judicial scrutiny of counsel's performance must be highly deferential, and a court

11

must indulge a strong presumption that counsel's conduct falls within the wide range of

12

reasonable professional assistance.  <u>Id.</u> at 689.

13

14

The second prong is prejudice: petitioner must establish that "there is a reasonable

15

probability that, but for counsel's unprofessional errors, the result of the proceeding would

16

have been different."  <u>Id.</u> at 694.  "A reasonable probability is a probability sufficient to

17

undermine confidence in the outcome."  <u>Id.</u>  In determining whether a defendant was

18

prejudiced, "a verdict or conclusion only weakly supported by the record is more likely to

19

have been affected by errors than one with overwhelming record support."  <u>Id.</u> at 696.

20

As petitioner needs to satisfy both elements of the claim, the court need not address

21

both components of the inquiry if the defendant makes an insufficient showing on one.  <u>Id.</u> at

22

697.  An ineffectiveness claim therefore can be disposed of for either lack of sufficient

23

prejudice to petitioner or by petitioner's failure to demonstrate deficiency on the part of

24

counsel.  <u>Id.</u>; <u>see</u> <u>also</u> <u>Siripongs v. Calderon</u>, 133 F.3d 732, 737 (9th Cir. 1998).

25

Applying the appropriate standard of review to the ineffectiveness claim, petitioner

26

must ultimately establish that the state court applied a standard other than <u>Strickland</u> or

27

"applied <u>Strickland</u> to the facts of his case in an objectively unreasonable manner."  <u>Bell v.</u>

28

*Cone*, 535 U.S. 685, 699 (2002).  This analysis makes the <u>Brecht</u> harmless error review superfluous because the prejudice analysis under <u>Strickland</u> is complete in itself.  See <u>Avila v. Galaza</u>, 297 F.3d 911, 918 n.7 (9th Cir. 2002).

  1. <u>Admission of Gun Evidence</u>

  Petitioner claims his counsel was ineffective for not objecting on due process grounds to the admission of evidence that he owned guns and ammunition.  Failure to raise an objection only satisfies the prejudice prong of <u>Strickland</u> if petitioner can to show that "but for" his counsel's failure to raise such an objection, there is a reasonable probability that "the result of the proceeding would have been different."  <u>Strickland</u>, 466 U.S. at 694.  Consequently, trial counsel cannot be ineffective under <u>Strickland</u> for failing to raise a meritless objection, as there will be no impact on the outcome of the trial.  See <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1273 (9th Cir. 2005).

  Before trial, petitioner's counsel moved in limine to exclude "all evidence of guns and ammunition not connected to the case" on grounds of "reliability and relevance" but the judge overruled the objection, concluding that "the probative value of the evidence outweighs any possibility of undue or unfair prejudice."  (Slip Op. at 19.)  In addition to the charges upon which White was convicted, he was also charged with gun use enhancements, but the jury ultimately did not find true the allegations that he personally used a gun.  (<u>Id.</u>)

  The California Court of Appeal disposed of the claim of ineffectiveness by finding no prejudice under <u>Strickland</u>[1]:

> Even if we were to assume that the trial court erred in admitting the gun and ammunition evidence, we would find the error harmless. The jury found all gun use enhancements to be not true as to both Gadsden and White. There was overwhelming evidence that both defendants otherwise committed the charged offenses.

---

[1]As the California Court of Appeal applied <u>Strickland</u> in analyzing all of petitioner's claims of ineffective assistance of counsel, its decision was not "contrary to" clearly established federal law under 28 U.S.C. § 2254(d)(1).  See <u>Williams</u>, 529 U.S. at 413.

1  (Slip Op. at 20.)

2      It is unlikely that any objection by White's attorney on due process grounds would

3  have been sustained.  Petitioner correctly states that "admission of prejudicial character

4  evidence from which no permissible inference can be drawn also violates due process."

5  McKinney v. Reese, 993 F.2d 1378, 1382-6 (9th Cir. 1993).  As the California Court of

6  Appeal pointed out, however, there was a permissible inference to be drawn form the gun

7  evidence:

8          White relies on....cases [that] found prejudicial error in admitting
          evidence that the defendant possessed a weapon which was obviously not the
9          one used in the charged offense. That is not the case here. There was evidence
          that White pointed a gun with a long barrel at Solorio, and that Gadsden also
10         had a gun. White told his mother to look for and hide firearms she referred to
          as "long" and "short."
11

12  (Slip. Op. at 20.)

13      The permissible inference, therefore, is that White owned the very weapon that was

14  allegedly used in the commission of the crime.  There would be a violation of due process

15  under McKinney only if there were no permissible inference to be drawn from the gun

16  evidence other than that White had a criminal disposition or bad character.  See McKinney,

17  993 F.2d 1378.  But as there was a permissible inference to be drawn from the gun evidence,

18  there was no violation of due process.  See Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th

19  Cir. 1991).  Because any objection to the admission of evidence on due process grounds was

20  unlikely to succeed, counsel's failure to make such an objection was neither deficient nor

21  prejudicial.  See Juan H., 408 F.3d at 1273; see also Rupe v. Wood, 93 F.3d 1434, 1445 (9th

22  Cir. 1996) (holding that "the failure to take a futile action can never be deficient

23  performance" on the part of trial counsel).

24      As an objection on due process grounds was likely futile, the state court was

25  reasonable in rejecting this claim under the prejudice prong of Strickland.  Therefore, this

26  claim cannot serve as the basis for habeas relief.

27

28

1

2.    <u>Admission of Arrest Warrant</u>

2

Petitioner claims that his counsel was ineffective in failing to object on due process

3

grounds to the admission of evidence that there was a warrant out for his arrest at the time of

4

offense.  As noted above, there is no ineffectiveness when counsel fails to make a meritless

5

objection.  <u>See</u> <u>Juan H.</u>, 408 F.3d at 1273.

6

7

At trial, the prosecutor was able to introduce evidence of an existing arrest warrant to

8

impeach petitioner during cross-examination:

9

> During his direct examination, White testified that he did not call the
> police to tell them what happened the night of the incident because, "I didn't
> want to have any involvement with the police or anything that happened." Prior
> to cross-examining White, the prosecutor requested permission to impeach
> White with the fact that he had an outstanding arrest warrant. "When asked
> why he didn't call the police, he said he didn't want to get involved with them.
> And that's not the whole truth. I'm quite convinced the reason he didn't want to
> call the police is that he had a warrant out for his arrest. It's not quite as
> innocent as he's made it out to be." Defense counsel objected on the grounds of
> relevancy, but the court overruled the objection.

10

11

12

13

14

(Slip Op. at 21.)

15

16

As with Claim 1, a due process objection to the admission of the warrant evidence

17

would likely fail because the jury could draw a permissible inference therefrom.  When the

18

prosecutor caught petitioner being less than forthcoming about his motive for not contacting

19

the police, the jury could properly infer from the outstanding warrant that petitioner was not

20

being truthful.  This type of inference is permissible and the admission of the evidence of the

21

existing warrant did not violate due process.  <u>See</u> <u>McKinney</u>, 993 F.2d 1378.

22

Consequently, trial counsel's failure to make such a due process objection was neither

23

deficient nor prejudicial and the state court was reasonable in its application of <u>Strickland</u>.

24

Accordingly, habeas relief is not warranted on this claim.

25

3.    <u>Admission of Cheryl White's Statements</u>

26

Petitioner claims his counsel was ineffective for failing to object on Confrontation

27

28

1   Clause grounds to the admission of Cheryl White's hearsay statements to Detective Mata.

2   As previously noted, if this objection would not have been successful, counsel was not

3   deficient. See Juan H., 408 F.3d at 1273. Whether an objection would have succeeded is

4   evaluated under the law controlling at the time the objection would have been made. See

5   Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998) (holding that the relevant inquiry is

6   not what defense counsel could have done, but rather whether the choices made by defense

7   counsel were reasonable when made).

8       Cheryl White's statements were admitted at trail in the following manner:

9
10          White's counsel brought a hearsay objection when the prosecutor first
        questioned Detective Mata about his conversation with Cheryl regarding her
        telephone conversations with White. The prosecutor argued that Cheryl's
11      responses were a statement against interest because she was attempting to hide
        weapons which were potential evidence in the case. Cheryl was charged as an
12      accessory and was awaiting trial. White's counsel objected that Cheryl had
        been subpoenaed as a witness and had not invoked her Fifth Amendment
13      rights, and that there was no mention of a rifle being involved in the case. "So
        the fact that she may have been concealing weapons in her car is totally
14      irrelevant to the charges." The court sustained the objection.
            The next morning, Cheryl appeared with counsel, outside the presence
15      of the jury, and invoked her Fifth Amendment right not to testify. Later that
        day, the prosecutor recalled Detective Mata. Defense counsel stated that she
16      had no objection to his testimony, as long as it was limited to Cheryl's
        statements. Detective Mata then testified regarding Cheryl's statement
17      explaining her phone conversations with White and the meaning of "long,"
        "Mike," and "short."

18

19   (Slip Op. at 23.)

20       The Court of Appeal rightly concluded that at the time of trial and under Supreme

21   Court precedent controlling at that time, White's counsel made no error:

22          The prosecutor showed that Cheryl was unavailable, that her statements
        were against her penal interest when made, and that the statements were
23      sufficiently reliable to warrant admission. Cheryl had invoked her Fifth
        Amendment right not to testify. She knew at the time that she made the
24      statements, based on her telephone conversations with White as well as
        Detective Mata's statements to her, that White was charged with robbery and
25      that firearms were involved. The statements she made were sufficiently
        reliable, as the items she discussed were found by Detective Mata where she
26      said they would be. It is not reasonably probable that had counsel raised an
        Evidence Code section 1230 objection, the objection would have been sustained.
27          At the time of trial, it was settled that admission of a hearsay statement

28

1
2
3
4
5
6
7
8

possessing sufficient indicia of reliability to fall within the hearsay exception of a declaration against penal interest did not deny a defendant the right of confrontation guaranteed by the United States Constitution. (Ohio v. Roberts (1980) 448 U.S. 56, 66, 65 L. Ed. 2d 597 (Roberts); People v. Greenberger (1997) 58 Cal.App.4th 298, 330-331.) Thus, at the time of trial, a confrontation clause objection by counsel would likewise have been unavailing. The United States Supreme Court has recently overruled Roberts and held that, unless the defendant had an opportunity to cross-examine the declarant when the statement against penal interest was made, admission of the statement does violate the confrontation clause. (Crawford, supra, at p. 2017.) As White did not have an opportunity to cross-examine Cheryl at the time her statements to Detective Mata were made, Crawford now precludes the admission of Cheryl's statements. However, counsel cannot be faulted for failing, at the time of trial, to anticipate that the United States Supreme Court would overrule Roberts and 24 years of precedent following it.

9
10

(Slip Op. at 21.)

11
12
13
14
15
16
17
18
19

Petitioner's claim fails under the deficiency prong of <u>Strickland</u>.  The performance of petitioner's counsel did not fall below an "objective standard of reasonableness," as the inquiry in an ineffectiveness claim is certainly not what a counsel could have done to overturn existing law.  <u>Strickland</u>, 466 U.S. at 687-8; <u>see also</u> <u>Babbitt</u>, 151 F.3d at 1173. Instead, a Confrontation Clause objection to Cheryl White's out-of-court statements would have been without merit under the law in effect at the time; therefore, counsel cannot be ineffective for failing to make such an objection.  <u>See</u> <u>Juan H.</u>, 408 F.3d at 1273. Consequently, the state court's application of <u>Strickland</u> was reasonable when it found no deficiency on the part of counsel.  This claim does not provide grounds for habeas relief.

20

4.      <u>Absence of Limiting Jury Instruction Regarding Taplin's Plea</u>

21
22
23
24
25
26
27

Petitioner claims his counsel was ineffective for failing to request a limiting jury instruction regarding Taplin's no contest plea.  The purpose of a limiting instruction would have been to caution the jury that they could not use evidence of Taplin's plea to infer petitioner's guilt.  Under the prejudice prong of <u>Strickland</u>, the omission of a jury instruction must make it reasonably probable that "the result of the proceeding would have been different" had a different instruction been given.  <u>Strickland</u> 466 U.S. at  694.  The significance of an omitted instruction should be evaluated in comparison to the instruction

28

1    that was in fact given.  See Murtishaw v. Woodford, 255 F.3d 926, 971 (9th Cir. 2001).

2        At trial, the no contest plea was admitted for the express purpose of confronting

3    Taplin's girlfriend Jasmine after she apparently disavowed the version of events she had

4    previously told police:

> Jasmine testified that Taplin was her boyfriend, and that they were both present in her garage when Gadsden arrived there at 2:30 a.m. on June 18, 2001, but she denied making the statements to Detective Mata that he attributed to her. In an attempt to show her bias, the prosecutor asked Jasmine whether she was aware that Taplin was charged with possession of stolen property as a codefendant in this case. When Jasmine answered in the affirmative, the prosecutor then asked her whether she was aware that Taplin had pleaded guilty to the charges. Jasmine responded that she was not aware of that, and that she had spoken to Detective Mata before Taplin was charged.

(Slip Op. at 14.)

        The Court of Appeal concluded that regardless of whether White's counsel should

have requested a limiting instruction, that no prejudice resulted:

> We also find no incompetence of counsel warranting reversal. A conviction will not be reversed on appeal based on a claim of ineffective assistance of counsel unless a defendant establishes both (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to the defendant would have resulted. If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails. (People v. Padilla (1995) 11 Cal.4th 891, 935-936 (Padilla), overruled on another ground in People v. Hill (1999) 17 Cal.4th 800, 823, fn. 1.)

> We will assume for the sake of discussion that defense counsel should have requested a limiting instruction after Jasmine's testimony. However, we conclude that defendants were not prejudiced by the absence of such an instruction. The prosecutor presented the evidence of Taplin's guilty plea for the limited purpose of showing Jasmine's bias. The prosecutor's argument about the evidence limited the relevance of the evidence. The facts of the case, including the fact that the stolen property was recovered from Gadsden and White, overshadows the potential prejudice of the plea evidence. The court gave CALJIC No. 2.09, although it did not instruct that it applied to evidence of Taplin's plea. The possibility that such an instruction, had it been requested and given, would have led to a result more favorable to defendants is not reasonably probable " 'since the likelihood of the jury's using the evidence for an improper purpose was so minimal under the facts of this case that any conceivable error was harmless.'" (Padilla, supra, 11 Cal.4th at p. 951.)

(Slip Op. at 16.)  This is a reasonable application of the <u>Strickland</u> standard because, as the Court of Appeal reasons, the lack of a cautionary instruction did not likely result in prejudice to petitioner.  The plea evidence was admitted for the limited purpose of providing a potential source of bias for Jasmine's testimony.  The prosecutor only presented the evidence for that limited purpose, and did not attempt to expand the purpose for which the evidence could be considered or make any guilt-by-association argument.  (RT at 593.)  In addition, the jury was given a general limiting instruction, pursuant to CALJIC No. 2.09[2], to only consider evidence for the limited purpose for which it was admitted.  And although this instruction was not specifically directed at the evidence of Taplin's no contest plea, it significantly reduces the impact of the omitted instruction.  See <u>Murtishaw</u>, 255 F.3d at 971.

Assessing the omitted instruction within the context of the trial record and the instruction that was given, the lack of a specific limiting instruction regarding Taplin's no contest plea does not undermine confidence in the verdict.  See <u>Strickland</u>, 466 U.S. at 694.  As a result, the state court reasonably concluded that counsel's failure to request such an instruction was not prejudicial, and the claim fails as a basis for habeas relief.

5.    <u>Solorio's Alleged Request to Buy Ecstasy</u>

Petitioner claims his counsel was ineffective for failing to argue that Solorio's alleged request to purchase ecstasy should be admitted as circumstantial evidence of Solorio's intent to willingly accompany petitioner.  To satisfy the prejudice prong of <u>Strickland</u>, petitioner would need to show that while the statement was admitted at trial for the purpose of establishing his own state of mind, had it been admitted for the purpose of establishing Solorio's state of mind, it is reasonably probable that "the result of the proceeding would have been different."  <u>Strickland</u>, 466 U.S. at  694.

---

[2]CALJIC No. 2.09 provides: "Certain evidence was admitted for a limited purpose. At the time this evidence was admitted you were instructed that it could not be considered by you for any purpose other than the limited purposed for which it was admitted.  Do not consider this evidence for any purpose except the limited purpose for which it was admitted."

1    At trial, as per counsel's motion, the statement was admitted, but <u>only to show</u>

2   <u>petitioner's state of mind</u>:

3        White testified that Solorio asked, "Do you guys know where to get
     some ecstasy[?]" The prosecutor had objected to admission of this testimony,
4        but the trial court overruled the objection when White's counsel stated that the
     testimony was not offered for its truth but only to show White's state of mind.
5        During his argument to the jury, the prosecutor reminded the jury that the court
     had ruled that the testimony was not admitted for its truth but only to show
6        White's state of mind. The prosecutor argued that the evidence was admitted to
     show why White did what he did, but that the jury was not allowed to consider
7        it proved that the statement was made or its effect on Gadsden. " 'You are not
     to consider this evidence for any purpose except the limited purpose for which
8        it was admitted.' "

9   (Slip Op. at 17.)

10   The Court of Appeal determined that this claim failed under the prejudice prong of

11  <u>Strickland</u> because the jury was able to consider the evidence to evaluate petitioner's state of

12  mind and nonetheless convicted upon the kidnapping charge:

13       Defendants argue on appeal that their counsel rendered ineffective
     assistance by failing to offer the evidence of Solorio's request to buy ecstasy as
14       circumstantial evidence of Solorio's intent and conduct in conformity with that
     intent: "the request tended to prove that Solorio went willingly with
15       [defendants] and was not kidnapped. If admitted for this purpose, evidence of
     Solorio's inquiry would have supported the defense theory that he lied about
16       the charged offense to avoid getting in trouble for trying to buy ecstasy to take
     with underage girls." We find no incompetence of counsel.
17       The jury was allowed to consider White's testimony about Solorio's
     request to buy ecstasy for the effect it had on White. That is, the jury could
18       have properly considered the statement as evidence that White believed that
     Solorio was driving the car with defendants willingly. Accordingly, the jury
19       could have found that there was no kidnapping because Solorio was not moved
     against his will, as Gadsden's counsel argued to the jury. The jury necessarily
20       rejected counsel's argument when it found both defendants guilty of
     kidnapping. Neither defendant was prejudiced by their counsel's failure to
21       request that the testimony be admitted as circumstantial evidence that Solorio
     went with defendants willingly and was not kidnapped.

22
    (Slip Op. at 18.)
23
     Petitioner's state of mind, however, is not the only probative factor.  The jury was
24
    instructed that to convict petitioner of kidnapping to commit robbery[3], they would need to
25

26       [3]CALJIC No. 9.54 provides:
27       "In order to prove this crime, each of the following elements must be proved:
     1. A person was [unlawfully] moved by the use of physical force; [or] A person
28
    N:\MJJ\Week of 7.16.07\white.dny.wpd                16

1  find that the <u>victim</u> was both "compelled to move because of a reasonable apprehension of

2  harm" and that the movement "was without that person's consent." (CT at 472-4.) The

3  defense theory that Solorio went along willingly on a drug deal would negate both of these

4  elements, because he would have been moving consensually and not as a result of an

5  apprehension of harm. Therefore, evidence of Solorio's state of mind, if persuasive, could

6  also be important in determining petitioner's guilt.

7       As a result of the limited admission of the statement, however, the prosecutor was able

8  to effectively limit the jury to only considering its effect on petitioner's state of mind:

9           And the specific thing I'm talking about is Mr. White claims that Jesus
            Solorio said, "Do you know where I can get some X?" I objected. The judge
10          said it comes in only – not for the truth, but only as how it informed you about
            Mr. White's state of mind.
11          So it's about what he thinks about it, not that it was actually said, not
            that it's true, not that – you can't – I know it's difficult. I see some of you
12          puzzling over it. It's to inform you about why he did what he did. No effect on
            Mr. Gadsden. You can't say, "Oh, it's been proven that Jesus Solorio wanted
13          ecstasy." It hasn't. You are, by law, not allowed to do that.
            "You are not consider this evidence for any purpose except the limited
14          purpose for which it was admitted."

15 (RT at 669-70.)

16      Petitioner satisfies the deficiency prong of <u>Strickland</u> because a reasonably competent

17 defense attorney would have known that the hearsay rule does not apply to a statement

18 "offered to prove conduct of the declarant in conformity with that state of mind." <u>People v.</u>

19 <u>Jones</u>, 917 P.2d 1165 (Cal. 1996); <u>see</u> <u>also</u> Cal. Evid. Code § 1250. As petitioner's testimony

20 was evidence that was central to the defense theory, this performance falls below an

21

22          was [unlawfully] compelled to move because of a reasonable apprehension of
            harm;
23          2. The movement of that person was caused with the specific intent to commit
            robbery, and the person causing the movement had the required specific intent
24          when the movement commenced;
            3. The movement of the person was without that person's consent;
25          4. The movement of the person was for a substantial distance, that is, a distance
            more than slight, brief or trivial; and
26          5. The movement substantially increased the risk of harm to the person moved,
            over and above that necessarily present in the crime of robbery itself."
27

28

"objective standard of reasonableness" under <u>Strickland</u>.  466 U.S. at 687-8.

The prejudice prong, however, is where petitioner's claim fails.  If counsel had not been deficient, the jury would still need to find petitioner's story to be credible.  But the jury clearly did not believe petitioner's statement when it was admitted for the purpose of establishing his own state of mind.  By convicting petitioner, the jury necessarily disbelieved his testimony that Solorio had asked to purchase ecstasy from petitioner and Gadsden; otherwise, as the California Court of Appeal explained, had they believed such testimony, they could not have found petitioner had the requisite intent for kidnaping.   It is unlikely that the jury would have believed petitioner's statement as it applied to Solorio's state of mind even though they did not believe it about his own state of mind.

Therefore, the state court's application of <u>Strickland</u> was reasonable in finding no prejudice: it is not reasonably probable that if the alternate basis for admission had been advanced that the jury would have returned a different verdict.  <u>See</u> <u>Strickland</u>, 466 U.S. at 694.  Hence, this claim is inadequate for relief.

     6.    <u>Exclusion of Solorio's Prior Misconduct</u>

Petitioner claims his counsel was ineffective in failing to object to the exclusion of evidence of Solorio's prior misdemeanor conviction on the grounds that excluding such evidence violated his constitutional rights to due process, to confront witnesses against him, and to present a defense.  Because there is no ineffectiveness of counsel for not making futile objections, the court must examine whether such objections had merit.  <u>See</u> <u>Juan H.</u>, 408 F.3d at 1273.

At trial, the judge ruled that Solorio's prior misdemeanor conviction for sex with a minor was more prejudicial than probative and excluded use of the evidence for impeachment purposes:

> The prosecutor moved in limine to exclude, on Evidence Code section 352 7 grounds, evidence that Solorio had an October 2001 misdemeanor conviction for having sexual intercourse with a minor more than three years younger than him ( § 261.5, subd. (c)). The prosecutor argued that the jury was

1
2
3
4

likely to overreact to the conviction resulting in substantial prejudice and that proving the underlying conduct would result in an undue consumption of time. At the hearing on the motion, the prosecutor conceded that the offense was a crime of moral turpitude. The court disagreed that it would involve an undue consumption of time, but felt that the probative value of the evidence was outweighed by its undue prejudice "given the nature of the conviction to the witness and potential for confusing the issues."

5   (Slip Op. at 10-11.)

6        The Confrontation Clause does not prevent a trial judge from imposing reasonable

7   limits on cross-examination based on concerns of harassment, prejudice, confusion of issues,

8   witness safety or interrogation that is repetitive or only marginally relevant.  See Van

9   Arsdall, 475 U.S. at 679.  To determine whether a criminal defendant's Sixth Amendment

10  right of confrontation has been violated by the exclusion of evidence on cross-examination, a

11  court must inquire whether: "(1) the evidence was relevant; (2) there were other legitimate

12  interests outweighing the defendant's interests in presenting the evidence; and (3) the

13  exclusion of evidence left the jury with sufficient information to assess the credibility of the

14  witness."  See United States v. Beardslee, 197 F.3d 378, 383 (9th Cir. 1999) (citing United

15  States v. James, 139 F.3d 709, 713 (9th Cir.1998)).

16        Revealing possible bias or self interest on the part of a prosecution witness is part of

17  the right to confront, cross examine and test the credibility of that witness before the jury.

18  See Chipman v. Mercer, 628 F.2d 528, 530 (9th Cir. 1980).  But so long as the jury is given

19  sufficient information to evaluate the witness's biases and motivations without the disputed

20  material, there is no Confrontation Clause violation.  See United States v. Bridgeforth, 441

21  F.3d 864, 868 (9th Cir. 2006).

22        The due process right to a fair trial and the right to present a defense (similar to the

23  Confrontation Clause inquiry) require balancing multiple factors to determine whether the

24  exclusion of evidence is improper: (1) the probative value of the excluded evidence on the

25  central issue, (2) its reliability, (3) whether it is capable of evaluation by the trier of fact, (4)

26  whether it is the sole evidence on the issue or merely cumulative, and (5) whether it

27  constitutes a major part of the attempted defense.  Su Chia v. Cambra, 360 F.3d 997, 1004

28

1    (9th Cir. 2004).  This balancing, however, is done while remaining mindful of the state

2    interests underlying the evidentiary rules on which the exclusion was based.  Id. at 1006.

3         According to the Court of Appeal, the jury still had a sufficient basis to determine

4    Solorio's credibility even absent the evidence of prior misconduct:

5         The trial court in this case consciously exercised its discretion under
     Evidence Code section 352. The court concluded that although the
6         misdemeanor evidence was admissible for impeachment, it was also highly
     prejudicial, given the nature of the conviction, and had a potential for confusing
7         the issues.  In general, a misdemeanor is a less forceful indicator of immoral
     character or dishonesty than is a felony. (Wheeler, supra, 4 Cal.4th at p. 296.)
8         In addition, misdemeanor conduct evidence entails problems of moral turpitude
     evaluation that felony convictions do not present (ibid.) and crimes involving a
9         general readiness to do evil are less indicative of a witness's veracity in
     testifying than crimes of dishonesty. (People v. Thornton (1992) 3 Cal.App.4th
10        419, 422.) The trial court acted within the bounds of its discretion under
     Evidence Code section 352 when it found that the relevance of Solorio's
11        misdemeanor conduct was outweighed by its prejudice and potential for
     confusion. We will not disturb the trial court's ruling.
12        Nor do we find that trial counsel rendered ineffective assistance by
     failing to object to the trial court's ruling on the grounds that it violated their
13        constitutional rights to confrontation and to present a defense. A trial court may
     restrict cross-examination of an adverse witness pursuant to Evidence Code
14        section 352 despite the strictures of the confrontation clause. (People v.
     Quartermain (1997) 16 Cal.4th 600, 623-624 (Quartermain).) "The ordinary
15        rules of evidence do not infringe on a defendant's right to present a defense.
     [Citation.] Trial courts possess the 'traditional and intrinsic power to exercise
16        discretion to control the admission of evidence in the interests of orderly
     procedure and the avoidance of prejudice.' [Citation.]" (People v. Frye (1998)
17        18 Cal.4th 894, 945 (Frye).) A trial court's limitation on cross-examination
     regarding the credibility of a witness does not violate the confrontation clause
18        unless a reasonable jury might have received a significantly different
     impression of the witness's credibility had the excluded cross-examination been
19        permitted. (Frye, supra, 18 Cal.4th at p. 946; Quartermain, supra, 16 Cal.4th at
     ¶. 623-624.)
20        In this case, Solorio was repeatedly confronted with contradictions
     between his trial testimony and prior statements, and his credibility was
21        extensively impeached. Solorio admitted that he had told different stories when
     he first reported the robbery the night it occurred, when he talked to Detective
22        Mata on June 19, 2001, when he testified at the preliminary hearing, and when
     he testified at trial. For instance, at the preliminary hearing and at trial, Solorio
23        testified that he was inside his car when defendants came up and asked about
     the stereo, but in his first statement to police he said that Gadsden pointed a
24        gun at him and ordered him into the car. In his statement to Detective Mata he
     said that Gadsden asked him for a cigarette, White entered the rear passenger
25        seat of the car and pointed a gun at him, and Gadsden ordered him into the car
     because "We're going for a ride." At trial Solorio testified that White was in the
26        front seat and did not pull a gun until after the officer entered and left the
     parking lot. At the preliminary hearing Solorio testified that White had a pocket
27        knife that he used to poke Solorio in the stomach, but at trial he admitted that

28

1
2
3
4
5

he had never mentioned a knife to police. In his statement to police Solorio said that he switched seats with White at a 7-11 store and that White drove to the apartment complex, while at trial Solorio testified that he himself drove to the apartment complex. ***Even if the trial court erred in failing to allow defendant to be cross-examined regarding his prior misdemeanor conduct, a reasonable jury would not have received a significantly different impression of Solorio's credibility. Thus, there was no confrontation clause violation and counsel cannot be faulted for failing to argue that there was.***

6

(Slip Op. at 12-14) (emphasis added).

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

Counsel for petitioner attempted to advance a theory connecting Solorio's prior misdemeanor conviction for sex with his underage girlfriend, his taking underage girls to the club on the night in question, and his alleged request to buy ecstasy. At trial, counsel for petitioner's co-defendant, Gadsden, argued against the exclusion of the prior misconduct, saying: "our defense is basically going to be a drug deal gone bad, . . . And I think that his going to a club with people who are basically underage, something which is consistent with what we hear from the moral turpitude prior, is something that the jury should know about Mr. Solorio." (Slip Op at 11.) On appeal, the argument was framed thus: "[a]dmission of the impeachment evidence would have strongly supported the defense theory that Solorio lied about the charged offenses in order to avoid getting in trouble for additional unlawful conduct with underage girls: trying to buy ecstasy to take with the seventeen and eighteen-year-old girls who accompanied him to the night club." (Appellant's Opening Brief at 23) (attached as Resp.'s Ex. C). The relevance of the prior misconduct purportedly goes to a specific bias or motivation: Solorio would be willing to lie about agreeing to go with petitioner to buy drugs in order to avoid getting in trouble himself.

22
23
24
25
26
27

In this case, however, the connection between the prior misconduct and the defense theory is simply too remote to cause a constitutional violation. The quintessential instance of biased self-interest is where a prosecution witness has received a deal in return for incriminating testimony. See Van Arsdall, 475 U.S. 673. In such a situation, the benefit to the witness is undisputed and the point of contention is whether the witness is biased as a result. But here, the source of bias is entirely speculative: Solorio's motive to lie exists only

28

if he did indeed try to buy ecstacy, a contention that finds little support in the record. Where the proffered motivation to lie on the part of the victim of a crime is barely more than a hypothetical, there is no constitutional guarantee to its admission, particularly when weighed against the state interest of excluding prejudicial evidence. Here, the inflammatory nature of Solorio's prior offense presented a considerable risk of undue prejudice.

The analysis under the Sixth Amendment right to mount a defense and under due process leads to the same conclusion. It is a constitutional violation to exclude critical, corroborative defense evidence, but there is no violation where the evidence is only of dubious probative value. See Su Chia, 360 F.3d at 1003; see also DePetris v. Kuykendall, 239 F.3d 1057, 1062 (9th Cir. 2001). When there is a countervailing state interest, exclusion of such evidence is often proper: "[w]hile the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Holmes v. South Carolina, 126 S. Ct. 1727, 1732 (2006).

Exclusion of evidence of Solorio's prior misdemeanor, which had only marginal relevance, did not violate the Confrontation Clause, the right to due process, or the right to raise a defense in light its inherently prejudicial nature. Thus, counsel could not raise meritorious objections to the exclusion of this evidence on these grounds. Consequently, counsel's failure to make such objections was neither deficient nor prejudicial, and the state court's denial of these claims was a reasonable application of federal law. Accordingly, petitioner is not entitled to habeas relief on this claim.

//

//

//

1

**CONCLUSION**

2          In light of the foregoing, the petition for a writ of habeas corpus is DENIED.

3          The Clerk shall close the file and terminate any pending motions.

4          IT IS SO ORDERED.

5     DATED:  7/11/2007

6                                        _____
                                         MARTIN J. JENKINS
7                                        United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28